No. 19-7132

## In the United States Court of Appeals for the District of Columbia Circuit

CHRISTINA TAH and RANDOLPH McCLAIN,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

GLOBAL WITNESS PUBLISHING, INC. and GLOBAL WITNESS,

*Defendants/Appellees-Cross-Appellants*.

Appeal from the United States District Court
for the District of Columbia, No 1:18-cv-02109-RMC

## BRIEF OF AMICI CURIAE NON-GOVERNMENTAL ORGANIZATIONS SUPPORTING APPELLEES/CROSS-APPELLANTS AND SEEKING REVERSAL IN PART

Gregory M. Lipper
CLINTON & PEED
777 6th Street NW, 11th Floor
Washington, DC 20001
(202) 996-0919
glipper@clintonpeed.com

*Counsel for Amici Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(A)(1)

## A. Parties and amici curiae

Except for the following amici, all parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellees/Cross-Appellants' brief: Cato Institute, Competitive Enterprise Institute, Council on Foreign Relations, Environmental Working Group, Human Rights First, International Crisis Group, Oceana, Oxfam American, PEN (America), Southern Poverty Law Center, and Union of Concerned Scientists.

## B. Rulings under review

References to the rulings at issue appear in Appellees/Cross-Appellants' brief.

## C. Related cases

1. *Arpaio v. Zucker*, No. 18-cv-2894, 2019 U.S. Dist. LEXIS 189291, (D.D.C. Oct. 31, 2019);

2. *Akhmetshin v. Browder*, No. 18-cv-1638, 2019 U.S. Dist. LEXIS 157802, (D.D.C. Sept. 16, 2019), appeal pending, No. 19-7129 (D.C. Cir.);

3. *Arpaio v. Cottle*, No. 18-cv-02387, 2019 U.S. Dist. LEXIS 134604, 2019 WL 3767104 (D.D.C. Aug. 9, 2019);

4. *Bauman v. Butowsky*, 377 F. Supp. 3d 1 (D.D.C. 2019);

5. *Fridman v. Bean LLC*, No. 17-cv-2041, 2019 U.S. Dist. LEXIS 7874 (D.D.C. Jan. 15, 2019);

6. *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018);

7. *Fairbanks v. Roller*, 314 F. Supp. 3d 85 (D.D.C. 2018);

8. *Libre by Nexus v. BuzzFeed, Inc.*, 311 F. Supp. 3d 149 (D.D.C. 2018);

9. *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109 (D.D.C. 2018); and

10. *Deripaska v. Associated Press*, 282 F. Supp. 3d 133 (D.D.C. 2017), appeal dismissed, No. 17-7164 (D.C. Cir. Dec. 8, 2017).

# CORPORATE DISCLOSURE STATEMENT

Amici are nonprofit organizations. None of the amici have any parent corporation, and no publicly held corporation owns 10% or more stock in any of amici.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings and Related Cases ....................................................... iii

Corporate Disclosure Statement ....................................................................................... iii

Table of Authorities ............................................................................................................ v

Glossary............................................................................................................................ viii

Identity and Interest of Amici Curiae and Source of Authority to File...................... 1

Certification Under Circuit Rule 29(d) ........................................................................... 4

Summary of Argument ....................................................................................................... 5

Argument .............................................................................................................................. 8

I.   The Act and the federal rules do not directly collide. ......................................... 9

    A.  After this Court decided Abbas, the D.C. Court of Appeals clarified that the Act does not require a heightened showing of success on the merits.......................................................................................................... 10

    B.  There is no direct collision from any perceived difference in the timing of or procedures governing the Act's special motions. .............................. 13

    C.  There is no direct collision from the Act's fee-shifting provision.............. 17

II.  Applying the Anti-SLAPP Act in federal court advances the twin aims of *Erie*............................................................................................................... 19

Conclusion.......................................................................................................................... 21

Certificate of Compliance

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Group, LLC,*
783 F.3d 1328 (D.C. Cir. 2015) ...................................................... 6, 11, 12

*Burke v. Air Serv. Int'l, Inc.,*
685 F.3d 1102 (D.C. Cir. 2012) ............................................................ 8

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949) ........................................................................ 18

*Competitive Enter. Inst. v. Mann,*
150 A.3d 1213 (D.C. 2016) ..................................................... 7, 12, 17

*Dalton v. Little Rock Family Planning Servs.,*
516 U.S. 474 (1996) ........................................................................ 14

*Dunning v. Quander,*
508 F.3d 8 (D.C. Cir. 2007) ......................................................... 14, 16

*Easaw v. Newport,*
253 F. Supp. 3d 22 (D.D.C. 2017) ..................................................... 12

*Erie R.R. Co. v. Tompkins,*
304 U.S. 64 (1938) ....................................................................... 8, 19

*Gasperini v. Center for Humanities, Inc.,*
518 U.S. 415 (1996) ...................................................................... 9, 19

*Hanna v. Plumer,*
380 U.S. 460 (1965) ...................................................................... 9, 20

*Hilton v. Hallmark Cards,*
599 F.3d 894 (9th Cir. 2009) ............................................................... 5

*Ikossi v. Dep't of Navy,*
516 F.3d 1037 (D.C. 2008) ................................................................ 16

*Jeffries v. Lynch*,
217 F. Supp. 3d 214 (D.D.C. 2016) ...................................................... 16

*Makaeff v. Trump Univ., LLC*,
736 F.3d 1180 (9th Cir. 2013) ............................................................ 11

*Nat'l Rev. v. Mann*,
140 S. Ct. 344 (Nov. 25, 2019) ............................................................. 2

*Parker v. Hoglander*, No. 15-926 (JDB),
2016 WL 3527014 (D.D.C. June 23, 2016) ......................................... 15

*Rice v. Norman Williams Co.*,
458 U.S. 654 (1982) .......................................................................... 10

*Serv. Emp. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care
Providers, LLC*, 312 F.R.D. 678 (D.D.C. 2015) ................................... 16

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) ...................................................................... 8, 10

*United States ex re. Folliard v. Gov't Acquisitions, Inc.*,
764 F.3d 19 (D.C. Cir. 2014) ............................................................. 16

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
190 F.3d 963 (9th Cir. 1999) ............................................................. 21

*Walker v. Armco Steel Corp.*,
446 U.S. 740 (1980) .......................................................................... 10

**Statutes**

Anti-SLAPP Act of 2010, D.C. Code § 16-5501, *et seq.* ............................. 5

D.C. Code § 16-5502(a) ......................................................................... 6

D.C. Code § 16-5502(b) ......................................................................... 6

D.C. Code § 16-5502(c) ........................................................................ 17

D.C. Code § 16-5504(a)................................................................ 6

**Other**

Council of the District of Columbia, Committee on Public Safety and the
Judiciary, Report on Bill 18-893 (Nov. 18, 2010).............................................. 6, 20

Dwight H. Merriam & Jeffrey A. Benson, *Identifying and Beating a Strategic
Lawsuit Against Public Participation*, 3 Duke Envtl. L. & Pol'y F. 17 (1993) .......... 5

Fed. R. Civ. P. 54(d)........................................................................ 17

Fed. R. Civ. P. 56(b)........................................................................ 15

Fed. R. Civ. P. 56(d)........................................................................ 15

# GLOSSARY

"SLAPP" stands for Strategic Lawsuits Against Public Participation.

"Act" or "Anti-SLAPP Act" stands for the Anti-SLAPP Act of 2010, D.C. Code § 16-5501 *et seq.*

"Council Report" stands for Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893 (Nov. 18, 2010).

## IDENTITY AND INTEREST OF AMICI CURIAE AND SOURCE OF AUTHORITY TO FILE

In accordance with Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b), counsel for both parties have consented to the filing of this brief.

Amici curiae are non-governmental organizations that exercise their First Amendment right to speak and advocate on issues of public concern.[*] They have a range of viewpoints, and they often disagree with each other and with other advocacy organizations. All of them, however, depend on anti-SLAPP laws to protect them from frivolous but costly lawsuits aimed at silencing speech expressing unpopular beliefs or exposing wrongdoing.

Because uniform application of anti-SLAPP laws is vital to the ability to speak and debate freely, this brief is joined by the following organizations:

**Cato Institute**, established in 1977, is a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato publishes books, studies, and the annual Cato Supreme Court Review, and it conducts conferences and forums.

---

[*] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party authored any part of this brief; no party or counsel for a party contributed money intended to fund the preparation or submission of this brief; and no person (other than amici curiae, their members, and their counsel) contributed money intended to fund the preparation or submission of this brief.

**Competitive Enterprise Institute** is a nonprofit organization, founded in 1984 and based in Washington DC, dedicated to promoting individual liberty and free markets. CEI's work is often controversial, and it has directly experienced the threat to free expression posed by SLAPP suits. *See, e.g., Nat'l Rev. v. Mann*, 104 S. Ct. 344 (Nov. 25, 2019) (Alito, J., dissenting from denial of cert.) (CEI as co-defendant is defamation lawsuit brought by scientist following criticism of his research on climate change).

**Council on Foreign Relations** is an independent, nonpartisan membership organization, think tank, and publisher. It is dedicated to helping people better understand the world and the foreign-policy choices facing the United States and other countries. CFR is also the publisher of *Foreign Affairs*, the preeminent journal of international affairs and U.S. foreign policy.

**Environmental Working Group** is a nonprofit organization dedicated to protecting human health and the environment. EWG educates and empowers consumers to make safer and more informed decisions about the products they buy and the companies they support.

**Human Rights First** is a non-governmental organization established in 1978. It works to ensure that the United States leads on human rights globally and complies domestically with its human-rights commitments. Its mission includes

holding both governmental and non-governmental actors accountable for human-rights abuses.

**International Crisis Group** is a nonprofit organization working to prevent wars and shape policies to build a more peaceful world. Crisis Group engages directly with a range of conflict actors to seek, share, and publish information and reports to encourage intelligent action for peace.

**Oceana** is a nonprofit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education. Oceana's campaigns oppose conduct that harms human health, the oceans, and the general environment, in areas such as seafood fraud, illegal fishing, and the production of single-use plastic.

**Oxfam America** is a global anti-poverty organization, operating in over 90 countries. It works to promote human rights, help communities achieve long-term sustainable development, hold powerful actors accountable, and provide humanitarian aid during conflicts and natural disasters.

**PEN (America)** is a nonprofit association of writers that includes poets, playwrights, essayists, novelists, editors, screenwriters, journalists, literary agents, and translators. PEN advocates for writers and literature and to protect the freedom of the written word wherever it is imperiled.

**Southern Poverty Law Center** is a nonprofit organization, founded in 1971, that works to make the nation's constitutional ideals a reality for everyone. In addition to engaging in legal advocacy and education, SPLC writes extensively about hate and extremism and publishes an annual census of active hate groups operating in the United States; it often faces defamation suits as a result of these reports.

**Union of Concerned Scientists** uses rigorous, independent science to solve the planet's most pressing problems. UCS combines technical analysis and effective advocacy to create innovative, practical solutions for a healthy, safe, and sustainable future.

## CERTIFICATION UNDER CIRCUIT RULE 29(D)

In accordance with Circuit Rule 29(d), amici certify that this brief is necessary to offer the unique perspective of nongovernmental advocacy organizations, which are especially vulnerable to SLAPP suits by plaintiffs who oppose their positions or advocacy on controversial issues. Amici are aware of another amicus brief, filed on behalf of news media organizations and addressing their unique concerns; amici are unaware of any other amicus briefs that are being filed on behalf of non-governmental advocacy organizations or similar types of nonprofit organizations.

## SUMMARY OF ARGUMENT

Wielded against citizens and organizations—including public-interest advocacy organizations—strategic lawsuits against public participation (SLAPPs) "masquerade as ordinary lawsuits." *Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2009). But unlike plaintiffs in ordinary cases, plaintiffs who bring SLAPP suits have little chance of winning in court. Their goal is not to win. Instead, plaintiffs bring these cases to "silence, harass[,] and obstruct political opponents" by wasting their time and depleting their often-limited funds—and thus to chill their protected speech. Dwight H. Merriam & Jeffrey A. Benson, *Identifying and Beating a Strategic Lawsuit Against Public Participation*, 3 Duke Envtl. L. & Pol'y F. 17, 17 (1993).

Because SLAPP suits weaponize the legal system to chill free speech on issues of public concern, a majority of states have passed laws to deter these lawsuits. In 2010, the District of Columbia joined them, by enacting Anti-SLAPP Act of 2010, D.C. Code § 16-5501, *et seq.* The D.C. Council passed the Act after finding that SLAPP suits "are often without merit, but achieve their filer's intention of punishing or preventing opposing points of view, resulting in a chilling effect on the exercise of constitutionally protected rights." Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 18-893, at 4 (Nov. 18,

2010) ("Council Report"). In light of these risks, the Act aims to ensure that "District residents are not intimidated or prevented, because of abusive lawsuits, from engaging in political or public policy debates." *Id.*

Several provisions protect speakers and advocates from censorious lawsuits. First, a defendant "may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(a). The court will grant that motion if (1) the defendant makes "a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest," and (2) the plaintiff fails to show the "claim is likely to succeed on the merits." *Id.* § 16-5502(b). If that motion is granted, moreover, the defendant may recover the legal fees spent defending against the frivolous SLAPP suit. *Id.* § 16-5504(a).

The District's law protects victims of SLAPP suits brought in local D.C. courts. But in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), this Court held that the Act does not apply to diversity suits brought in federal court, based on the Court's belief that the Act's "likelihood of success" is "different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." *Id.* at 1335. This belief, however, turned out to be wrong: A year later, the D.C. Court of Appeals held that the Act's threshold

requirement—that the suspected SLAPP suit be "likely to succeed on the merits"—"mirror[s] the standards imposed by Federal Rule 56." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1238 n.32 (D.C. 2016) (citations omitted).

Despite this ruling, the district court concluded that a conflict persists—and *Abbas* continues to control—because the Act allows defendants to file a special dismissal motion before discovery has concluded, forcing the plaintiffs to "show their hands" with specific evidence. But that, too, does not prevent applying the Act here. For one, this lawsuit was dismissed on the pleadings, under Rule 12(b)(6), such that no amount of discovery could have salvaged plaintiffs' claims; hypothetical conflicts in other cases are no reason to decline a conflict-free application in this case. Even in other cases, in which the pleadings state a claim as a matter of law, no unavoidable conflict is presented by a pre-discovery motion; Federal Rule of Civil Procedure 56 itself allows for summary-judgment motions before the end of—or even the start of—discovery, and thus put plaintiffs in the same position as does the Act.

Even before *Mann*, SLAPP suits brought in federal court were just as abusive as those brought in local court; protected speech is no less chilled merely because the plaintiffs have strolled a few extra blocks to the federal courthouse. And now that the D.C. Court of Appeals has clarified that SLAPP-suit plaintiffs in federal

court need not make a stronger showing than do SLAPP-suit plaintiffs in local courts, there is no reason to leave speakers exposed in federal court.

## ARGUMENT

Under the *Erie* doctrine, federal courts hearing state-law claims typically apply federal procedural law and state substantive law, so long as the latter does not directly collide with a federal rule. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). To determine whether a state provision applies in federal court, the latter applies a two-step test. *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012). To start, the federal court evaluates whether the state law directly conflicts with any Federal Rule of Civil Procedure. Then, if there is no conflict, the court determines whether the state law is substantive or procedural.

Because *Erie* treats D.C. law like state law for the purpose of the analysis, *see Burke*, 685 F.3d at 1107 n.4 the Anti-SLAPP Act applies in federal court if (1) it does not directly conflict with a federal rule, and (2) its protection is substantive rather than procedural. The Act meets both requirements.

First, the Act does not directly collide with a valid Federal Rule. Because the plaintiff's pleadings fail to state a claim as required by Rule 12(b)(6), the Act requires the lawsuit to be dismissed for the same reason as does the Federal Rules.

This means that there is no conflict between the state and federal standards, much less a "direct collision." *Hanna v. Plumer*, 380 U.S. 460, 465, 472 (1965). Although this Court's earlier decision in *Abbas* believed that the Act required plaintiffs to make a heightened showing, the D.C. Court of Appeals has since ruled that the required showing is the same as is required under the federal rules. And because *Abbas*'s predicate is gone, the Court is no longer bound by *Abbas*.

Second, the Act is substantive, not procedural. Applying the Act would promote *Erie*'s "twin aims": Avoiding unfair discrimination in administering state law and discouraging forum-shopping. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428 (1996). If the Act were deemed a procedural requirement that does not apply in federal court, then speakers sued under D.C. law would be protected only if they and the plaintiffs lived in different states. Knowing this, prospective plaintiffs will have every incentive to come up with a reason to file in federal court to deprive defendants of the Act's protection. This kind of procedural fencing would disserve both *Erie* and the Act itself, and leave the District's many advocacy organizations vulnerable to abusive lawsuits by powerful opponents.

## I.  The Act and the federal rules do not directly collide.

A Federal Rule of Civil Procedure blocks application of a state law only if the two come into "direct collision." *Hanna*, 380 U.S. at 472. The Anti-SLAPP Act, as

interpreted by the D.C. Court of Appeals, does not directly collide with any Federal Rule. A state provision and a Federal Rule "directly collide" only if the clash is "unavoidable" (*Walker v. Armco Steel Corp.*, 446 U.S. 740, 749 (1980)) or the provisions "flatly contradict each other" (*Shady Grove*, 559 U.S. at 405). "Hypothetical" or "potential" conflicts do not displace the state law, *see Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982); if the state law and federal rule "can exist side by side," there is no "direct collision." *Walker*, 446 U.S. at 752.

**A. After this Court decided *Abbas*, the D.C. Court of Appeals clarified that the Act does not require a heightened showing of success on the merits.**

In *Abbas*, this Court concluded that the Act requires plaintiffs to meet a higher standard than would otherwise be required by the federal rules. But that proved wrong. The D.C. Court of Appeals has since held that the Act's "likelihood of success" standard mirrors the standard imposed by the federal rules. Because *Abbas* depended on an assumption that was disproven, *Abbas* itself is no longer good law.

In *Abbas*, a speaker was sued in federal court and then invoked the Act. After the district court held that the Act did not apply in federal court, this Court affirmed that conclusion—concluding that the Act's requirement that the plaintiff show a "likelihood of success" directly collided with the federal rules. Without guidance

from the D.C. Court of Appeals, this Court held the "likelihood of success" standard was "different from and more difficult for plaintiffs to meet" than the dismissal and summary-judgment standards established by Rules 12 and 56. 783 F.3d at 1335. And because the federal rules "'establish the exclusive criteria for testing the . . . sufficiency of a claim in federal court,'" the Act could not replace those criteria with a requirement that was "different . . . and more difficult." *Id.* at 1334–35 (quoting *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013)).

Yet this Court acknowledged that in interpreting the Act, it was making only an educated guess. When *Abbas* was decided, the "D.C. Court of Appeals" had "never interpreted the . . . likelihood of success standard to simply mirror" the summary-judgment standard. *Abbas*, 783 F.3d at 1335. The Court recognized, however, that "an interesting issue could arise if a State anti-SLAPP act did in fact exactly mirror" Rule 56. *Id.* at 1335 n.3. Nevertheless, the Court believed that it did not need to address this "hypothetical" question, having concluded that the Act's "dismissal standard [did] not exactly mirror" Rule 56. *Id.*

A year later, the D.C. Court of Appeals interpreted the Act to mean what this Court had said it did not mean. Quoting and repudiating *Abbas*, the D.C. Court of Appeals held that the anti-SLAPP and summary-judgment standards are "the

same": The Act's standard "'simply mirror[s] the standards imposed by' Federal Rule 56." *Mann*, 150 A.3d at 1238 n.32 (quoting *Abbas*, 783 F.3d at 1335). As the D.C. Court of Appeals interpreted the Act, it recognized that its ruling "will no doubt factor into future analysis of the dicta in *Abbas* concerning the applicability of the Anti-SLAPP Act . . . in federal courts." *Id.*

As *Mann* implied, when a D.C. Court of Appeals decision "clearly and unmistakably renders inaccurate a prior decision by the D.C. Circuit interpreting D.C. law," this Court is bound by the "more recent expression of the law." *Easaw v. Newport*, 253 F. Supp. 3d 22, 35 (D.D.C. 2017). Here, "more recent expression" establishes that the Act's standard mirrors the summary-judgment standard. Because *Abbas* saw a "direct collision" that was not there, this Court may and must now apply *Erie* afresh. And *Mann* answers the substantive question, concluding that the Act adopts the same standard as does Rule 56, and thus does not collide with the federal rules. Under both provisions, courts ask "whether the evidence suffices to permit a jury to find for the plaintiff." 150 A.3d at 1238 n.32. Because the Act replicates the summary-judgment standard defined by Federal Rule of Civil Procedure 56, the standards under the Act and Rule 56 are "substantively the same." *Id.*

In this case, the lack of direct collision is even clearer. The district court dismissed the case under Rule 12, because the plaintiffs' complaint failed to state a claim for relief. When the plaintiffs' pleadings fail to state a legal claim, the federal rules require immediate judgment for the defendant—just as under the Anti-SLAPP Act.

**B. There is no direct collision from any perceived difference in the timing of or procedures governing the Act's special motions.**

*Mann* notwithstanding, the district court concluded that "special motions to dismiss under D.C.'s Anti-SLAPP Act still conflict with the Federal Rules of Civil Procedure and remain inapplicable in federal court." JA-95. In the district court's view, a special motion requires more of plaintiffs than does a motion under Rule 12(b)(6), because "a plaintiff must present evidence and cannot survive a special motion to dismiss merely by citing its pleadings." *Id.* And "unlike a motion for summary judgment," *id.*, added the district court, a special motion "requires the court to consider the legal sufficiency of the evidence presented *before discovery is completed*." *Id.* at 1238 n.2 (quoting *Mann*, 150 A.3d at 1238; emphasis added by district court). But for two reasons, the Act's special-motion procedure likewise produces no conflict—especially in cases like this one.

*First*, even if Rule 56 guaranteed plaintiffs more discovery than does the Act, discovery could not have helped the plaintiffs in this case. The district court granted

Global Witness's motion to dismiss under Rule 12(b)(6), because the plaintiffs' "pleadings are insufficient to overcome First Amendment protections for speech." JA-117. In other words, no quantity or combination of documents, admissions, and depositions can salvage plaintiffs' claims, which fail as a matter of law even if every fact they alleged were proven beyond a shadow of a doubt. *See* JA-103 ("A court must assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in favor of the plaintiff."). For the same reason, the claims would have been dismissed even if Global Witness had instead filed a pre-discovery motion for summary judgment under Rule 56: No discovery would have been "necessary," because the plaintiffs' claims still would fail "as a matter of law.'" *Dunning v. Quander*, 508 F.3d 8, 10–11 (D.C. Cir. 2007). In this case, then, both the Act and the federal rules would require the district court to dismiss the SLAPP suit—for the same reason, at the same stage of the case.

Because the Act's discovery provisions produce no conceivable collision in this case, the possibility of one in a different case does not prevent the Court from applying the Act here. After all, "state law is displaced only to the extent that it actually conflicts with federal law." *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (quotation marks omitted). The Court can leave hypothetical questions about more challenging pre-discovery motions for another day.

*Second*, and in any event, any potential collision would be avoidable even in a case in which the plaintiffs needed discovery to substantiate a claim that survives as a matter of law. In particular, the district court suggested that the federal rules do not "require[] the court to consider the legal sufficiency of the evidence presented before discovery is completed." JA-95 (emphasis and quotation marks omitted). As the district court understand the respective provisions, it is the Act, and only the Act, that requires plaintiffs to "show their hand" before discovery ends. *Id.*

But the Act is not so unique; Rule 56 does not let plaintiffs hide their hands before discovery ends. A party may move for summary judgment "at any time" until "30 days after the close of discovery." Fed. R. Civ. P. 56(b). The summary-judgment motion "can thus be too late, but not too early; 'at any time' does in fact mean 'at any time.'" *Parker v. Hoglander*, No. 15-926 (JDB), 2016 WL 3527014, at *3 (D.D.C. June 23, 2016).

A separate subsection then instructs a plaintiff "what to do if he believes discovery is necessary to fend off an early summary judgment motion." *Id.* (citing Fed. R. Civ. P. 56(d)). That subsection, Rule 56(d), requires plaintiffs to do a great deal: The plaintiff must "show by affidavit or declaration that, for specified reasons, it cannot present facts *essential* to justify its opposition." Fed. R. Civ. P. 56(d) (emphasis added). These requirements are more than formalities. Upon pain of pre-

15

discovery dismissal, the plaintiff "must articulate what facts it hopes to discover and why those facts are needed." *Serv. Emp. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 679 (D.D.C. 2015). And it must do so "with sufficient particularity." *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. 2008). Plaintiffs must show their hands—up close.

If a plaintiff cannot or will not explain what evidence is essential and why, Rule 56 requires the district court to dismiss the case, even with some or all of the discovery period remaining. District courts, in turn, have not hesitated to dismiss those cases. *See, e.g.*, *United States ex re. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 23 (D.C. Cir. 2014) (affirming summary-judgment grant, even though the defendant had "refused to respond to [the plaintiff's] discovery requests prior to filing its motion for summary judgment"); *Jeffries v. Lynch*, 217 F. Supp. 3d 214, 228 (D.D.C. 2016) (granting summary-judgment motion, even though "plaintiff has had no opportunity to depose any of his many colleagues whom he claims were involved in the alleged discriminatory and retaliatory activity"). For years before any D.C. Council member contemplated passing anti-SLAPP legislation, plaintiffs have been required to withstand summary-judgment motions earlier than they would like and to "provide reasons why discovery [is] necessary." *Dunning*, 508 F.3d at 10–11 (quotation marks omitted).

Especially as interpreted by *Mann*, the Act creates a similar regime. As under Rule 56, the Act allows defendants to file a pre-discovery dismissal motion. As under Rule 56, plaintiffs may not merely invoke their pleadings, but rather must identify "evidence [that] suffices to permit a jury to find for the plaintiff." 150 A.3d at 1238. And as under Rule 56, "[w]hen it appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome, the court may order that specified discovery be conducted." D.C. Code § 16-5502(c)(2). Given the comparable showings and disclosures required under Federal Rule of Civil Procedure 56, the Act's special-motion procedure creates no conflict, much less a collision that is direct or unavoidable.

**C. There is no direct collision from the Act's fee-shifting provision.**

Nor does the Act's fee-shifting provision directly collide with the federal rules. Under the Act, prevailing defendants are "presumptively entitled to an award of fees unless special circumstances make a fee award unjust." *Mann*, 150 A.3d at 1238. But the federal rules also allow courts to award legal fees to winning defendants. Under the federal rules, a defendant's eligibility for legal fees depends on the underlying "substantive law." Fed. R. Civ. P. 54(d)(2). And here, the Anti-SLAPP Act supplies that substantive law—just as Rule 54 contemplates.

This analysis is reinforced by the Supreme Court's decision in *Cohen v. Beneficial Industries Loan Corp.*, 337 U.S. 541 (1949), which held that the federal rules do not preempt state provisions that protect defendants from abusive lawsuits. *Cohen* involved a federal rule (then Rule 23, now Rule 23.1) requiring shareholder-derivative plaintiffs to fulfill additional requirements (such as verifying the complaint and identifying previous attempts to resolve the problem using internal corporate procedures). But the state law required shareholder plaintiffs to do even more: Namely, to post a bond covering the defendant corporation's legal fees and costs. That extra state requirement applied in federal court, because it presented "n[o] conflict" with federal law. *Id.* at 556.

*Cohen*'s reasoning produces the same result for the Act's fee-shifting provision. As in *Cohen*, the Act builds upon the federal rules' minimum requirements, further protecting defendants from baseless lawsuits and their steep costs. Also as in *Cohen*, the Act reinforces the federal rules and does not contradict them. If anything, the Act rests on even firmer ground than did the bond requirement upheld in *Cohen*, because under the Act the plaintiffs need not pay or post a dime unless and until their lawsuit is dismissed for failing to state a claim. And so as in *Cohen*, a defendant does not forfeit an important local protection merely because the plaintiff has shopped for a federal forum.

## II. Applying the Anti-SLAPP Act in federal court advances the twin aims of *Erie.*

Applying the Act in federal courts would also advance the "twin aims of the *Erie* rule": (1) avoiding unequal application of state law, and (2) discouraging forum-shopping. *See Gasperini*, 518 U.S. at 428 (quotation marks omitted).

First, applying the Act in federal court would avoid "discrimination" between litigants in state court and those in federal court, and it would promote "uniformity in the administration" of state law—"whether enforcement [is] sought in the state or in the federal court." *Erie*, 304 U.S. at 74–75. Without that uniformity, targeted speakers could not depend on the Act. Speakers facing abusive SLAPP suits in the District's local court could not only have baseless claims dismissed, but could recover legal fees upon prevailing. But if those same speakers happened to be sued in federal court, they would likely have to endure a longer, more burdensome lawsuit and pay their own legal fees and costs even if the SLAPP suit were dismissed in the end.

This sort of disparate treatment is bad enough under normal circumstances, but is even less tolerable when the lawsuits threaten—and are designed to stifle—the defendants' freedom to speak. Left unchecked and undeterred, these lawsuits can waste years of time and massive sums of money. Of course, every hour or dollar spent fighting an abusive lawsuit is one that cannot be used to advance the

organization's mission or contribute to public debate. And as both SLAPP plaintiffs and SLAPP defendants are well aware, the ultimate ruling is beside the point; in SLAPP suits, "litigation itself is the plaintiff's weapon of choice." Council Report, *supra*, at 4. Organizations without the means to fight these lawsuits may be forced to censor themselves, especially if their viewpoints are controversial or would expose wrongdoing or corruption by powerful individuals or groups who are likely to hold a grudge.

Uniformity between local and federal court is especially important in the District of Columbia, because many national advocacy organizations are located in the District and may be susceptible to suit here. As national organizations, moreover, they may be particularly likely to criticize or disagree with entities outside the District, and thus are even more likely to be sued under diversity jurisdiction in federal court. Uniform SLAPP protection, then, is even more important here.

Second, applying the Act in federal court prevents forum shopping. *See Hanna*, 380 U.S. at 467. Parties forum shop when differences between state and federal practices materially affect "the character or result of the litigation" or "the fortunes of one or both of the litigants." *Id.* at 468 n.9. The presence or absence of the Anti-SLAPP Act produces these effects. For instance, by facilitating recovery of legal fees and costs, the Act spares organizations like amici from paying a steep

litigation tax for exercising their First Amendment rights and thus ensures that they will not be chilled from speaking out in the future.

Prospective SLAPP plaintiffs know this, too. Because they hope to punish and deter disfavored speech by forcing speakers to waste time and money defending frivolous lawsuits, a "litigant interested in bringing meritless SLAPP claims would have a significant incentive to shop for a federal forum." *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999). Avoiding forum shopping, always important under *Erie*, is even more critical when well-heeled plaintiffs are shopping for a way to silence their critics.

## CONCLUSION

The Court should hold that federal courts sitting in diversity should apply the Anti-SLAPP Act's requirement that plaintiffs demonstrate that their claims are likely to succeed on the merits.

Respectfully submitted,

/s/ Gregory M. Lipper
Gregory M. Lipper
CLINTON & PEED
777 6th Street NW, 11th Floor
Washington, DC 20001
(202) 996-0919
glipper@clintonpeed.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(B), this brief contains 4,738 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), 7)(B)(iii).

In accordance with Federal Rule of Appellate Procedure 32(a)(5) & (6), this brief was prepared in a proportionally spaced typeface, 14-point Equity, using Microsoft Word 16.3.4.